[No. 27153.   Department One.   September 26, 1939.]

COMMERCIAL WATERWAY DISTRICT NO. 1 OF KING
COUNTY *et al., Respondents,* v. KING COUNTY
*et al., Appellants.*[1]

[1]Reported in 94 P. (2d) 491.

*Skeel, McKelvy, Henke, Evenson & Uhlmann, Eggerman & Rosling, B. Gray Warner,* and *William Hickman Moore,* for appellants.

*Shorett, Shorett & Taylor* and *Evans, McLaren & Littell,* for respondents.

ROBINSON, J.—The purpose of this action was to prevent the sale by King county of a tract of land abutting on the Duwamish waterway. The action was begun on August 11, 1937. On August 16, 1937, the land was sold at public auction to the Hemrich Brewing Company, a corporation. Subsequently, it was permitted to intervene in the action, and the cause proceeded as one to cancel and annul the deed. That relief was granted by a judgment and decree entered

on April 12, 1938. The Hemrich Brewing Company has appealed, and, although we find no notice of appeal by King county in the record, it is joined with the brewing company in the briefs, and all parties appear to recognize it as an appellant.

Approximately five-sixths of the tract included in the deed is part of a larger tract acquired by King county for a dock site in 1912 and 1913. On November 8, 1910, there was submitted to the voters of King county, and approved by them, a proposition for the issuance by King county of bonds in the principal amount of $1,750,000, to aid in a comprehensive harbor development project. The resolution of the county commissioners submitting the proposition to the vote of the people was incorporated in the notice of election and recited, among other things:

"WHEREAS, it has long been and is essential to the future growth, development and prosperity of King county that its one harbor·be made into a great and a cheap harbor, lest the commerce of the north Pacific Ocean, of Alaska, and of the Orient, be attracted to ports of other states or to British Columbia by reason of the development of harbors at such other parts now under way at expenditures many times greater than that herein proposed, and for the creation of such a harbor the county possesses natural advantages unsurpassed; and

"WHEREAS, the enterprise of artificial extension of present harbor facilities toward the end aforesaid has heretofore proceeded in parts and sections to the disadvantage of the whole; and

"WHEREAS, the project known as the Lake Washington Canal, though but a part of the harbor improvement, has heretofore received aid from the government of the United States to an extent exceeding $600,000 in money, and the last Congress appropriated the sum of $2,275,000 for the locks of said canal upon the continuing contract system, this county has procured and deeded to the government a considerable

part of the right of way for the same at an expense of upwards of $240,000, the state has granted several hundred thousand dollars in value of lands, tide, shore and upland, and has appropriated $250,000 in money in aid of the same, thereby recognizing the national, state and county benefit to be derived therefrom, and it will require further aid only to the extent of the sum of $75,000 which will pay for the excavation of the channel of said canal; and

"WHEREAS, the improvement of the south end of the harbor has now proceeded so far as the formation of commercial waterway district Number One for the straightening, widening and deepening of the channel of the Duwamish river at an estimated cost of $1,-500,000, of which $600,000 is properly a county expenditure to be contributed by the county in consideration of the benefit to the county from the improvement, and the remainder of the cost will be contributed by the Commercial Waterway District Number One in recognition of the local benefit; and . . .

"WHEREAS, the uplands and shore lands adjacent to said lakes and waters are, for the most part, in every respect suitable, convenient and inviting for manufacturing sites and other industrial uses, if only said lakes and waters were accessible by sea-going ships; but until said lakes and waters are so accessible, are of comparatively small value and are unattractive and unprofitable for such uses; and . . .

"WHEREAS, the topography of said city of Seattle fronting on Elliott bay is so hilly that there is but a narrow strip of land at or near the level of water transportation and all the water front on said bay, except a few street ends owned by said city, is privately owned and privately controlled, some of it by industrial concerns, but most of it by railroad and steamship lines, and said waterfront and the adjacent lands are much congested by business interests; and

. . .

"WHEREAS, said Duwamish river, straightened and deepened, as aforesaid, and said canal when constructed, will each serve the purpose of a great public highway into the interior of said county, whereby the

transportation and commercial facilities of said county will be largely augmented and manufacturing and business industries stimulated and developed,  . . .

"WHEREAS, the acquisition of sites for public wharves and docks and of other rights and interests necessary and proper to be acquired, for the purpose of better and fuller enjoyment of the benefits of· said public improvement by the people of King county, will reasonably cost $350,000; and  . . .

"WHEREAS, it is the intention of this resolution that King county shall bear its proper share of the cost of said improvement and of its several parts, and at the same time not in any way interfere with the progress of the commercial waterways aforesaid, but, on the contrary, leaving the said canal and commercial waterway districts free to proceed with their work under the law of their creation and thereby raise and expend the sums necessary to pay for the local benefits to each; and  . . .

"WHEREAS, said board is proposing and intending, if authorized and empowered so to do, to have King county, by and through said board, contract indebtedness for the object and purpose of the public improvement aforesaid, and in aid and furtherance and completion of the same to the amount of $1,750,000 to be expended under the directions of and subject to the approval of said board, as follows:  that is to say:

"$750,000 thereof in excavating the channel of said Lake Washington canal; $600,000 thereof in acquiring rights of way for, and in dredging along the same a straightened, widened and deepened channel for said Duwamish river along the line laid out by said Commercial Waterway District number one; $350,000 thereof in acquisition for public uses of sites for wharves and docks, and of other rights and interests necessary or proper to be acquired in aid and furtherance of said improvement, or of securing the drainage or commercial public facilities and benefits to be de-ʼ rived therefrom; and $50,000 in turning Cedar river into Lake Washington along lines to be adopted by said proposed Commercial Waterway District Number Two, subject to the approval of this board; and  . . ."

The bond issue, which was proposed by the resolution and authorized by a vote of the people, was validated by an emergency act promptly passed at the next session of the legislature. This act (Laws of 1911, chapter 3, p. 3, Rem. Rev. Stat., § 9666 [P. C. § 5850] *et seq.*) reads, in part, as follows:

"Section 1. That whenever the board of county commissioners of any county of the first class of this state shall deem it for the interest of the county to engage in or to aid the United States of America, the State of Washington, or any adjoining county or any city of this state, or any of them, in construction, enlargement, improvement, modification, repair or operation of any harbor, canal, waterway, river channel, *slip, dock, wharf, or other public improvement,* or any of the same, for the purposes of commerce, navigation, sanitation and drainage, or any thereof, *or to acquire, or operate wharf sites, dock sites,* or other properties, rights or interests, or any thereof, *necessary or proper to be acquired or operated for public enjoyment of any such public improvement,* and to incur indebtedness to meet the cost thereof and expenses connected therewith, and' issue bonds of the county for the payment of such indebtedness, or any thereof, such county is hereby authorized and empowered, by and through its county commissioners, to engage in or aid in any such public work or works, operation or acquisition, as aforesaid, and to incur indebtedness for such purpose or purposes to an amount, which, together with the then existing indebtedness of such county, shall not exceed five per centum of the taxable value of the taxable property in said county, as shown by the last previous assessment roll thereof for state and county purposes, and to issue the negotiable bonds of the county for all or any of such indebtedness and for the payment thereof, . . ." (Italics above and elsewhere in this opinion are supplied.)

Section 2, p. 4 (Rem. Rev. Stat., § 9667 [P. C. § 5851]), declared that every purpose mentioned in § 1 was a county purpose.

Section 3, p. 5 (Rem. Rev. Stat., § 9668 [P. C. § 5852]), provided that, in case the question of incurring such indebtedness or issuing any such bonds had been submitted to the voters of a first class county within one year prior to the day the act became effective and sufficient votes had been cast in the affirmative and all proceedings had as prescribed in § 1, then they were validated and confirmed, and the county authorized to proceed to incur the indebtedness, issue the bonds, and engage in the construction, acquisition, or operation of the public works intended and contemplated.

Notwithstanding this legislative action, the validity of the bonds was seriously challenged in a taxpayer's suit. The opinion rendered on the appeal of that action (*Blaine v. Hamilton,* 64 Wash. 353, 116 Pac. 1076, 35 L. R. A. (N. S.) 577) is very pertinent to our present inquiry. After quoting portions of the commissioners' resolution, the court said, in part:

"*The resolution was incorporated in the notice of election,* and recites, that it is essential to the future growth, development, and prosperity of the county that its one harbor be made into a great and cheap harbor, to the end that it may retain and develop its natural commercial advantages; that the former policy of improving the harbor in parts had not proven advantageous; that the present harbor facilities are inadequate; that the expansion of the harbor can be best accomplished by means of a canal connecting Lakes Union and Washington with the bay, straightening, widening, and deepening the channel of the Duwamish river, and turning the waters of Cedar river into Lake Washington; and that the three matters are so naturally and necessarily related that they are, in fact, a single project consisting of interdependent parts. *The resolution further recites that the acquisition of sites for public wharves and docks is essential to the improvement as an entirety.* The question was submitted to the people as a single proposition calling for

a vote, 'King County Harbor Bond Issue—Yes,' and 'King County Harbor Bond Issue—No.'

"The appellants' first and principal contention is that several separate, distinct, and independent enterprises were submitted to the people as a unit, compelling them to approve or reject the bond issue as an entirety, and that the election is therefore invalid. The argument is that such a submission permits a meritorious and popular measure to carry or to be borne down by an undesirable one, and that the people were not given an opportunity to exercise a full, free, and intelligent assent as the general law contemplates and requires."

After discussing a number of its decisions, the court stated this general conclusion:

"We are, therefore, committed to the view that distinct, unrelated, and independent objects or purposes must be separately submitted by the ballot."

But, continuing, the court said:

"Counsel for the appellants, in his oral argument, stated that the true test of whether a proposition is single is, will it stand alone. This, we think, is but one of the tests of singleness, and might often be no test at all. The true criterion is, are the several parts of the project so related that united they form in fact but one rounded whole. . . . *The item for wharves and docks is strongly condemned as bearing no relation to the other parts. . . . Experience has shown the wisdom of the public retaining control of such matters. The larger harbor would be incomplete if the public failed to provide aids for its utilization.* Wharves and docks are but adjuncts to the harbor. They are but connecting links between the highways of the land and the highways of the sea. They are to sea commerce what a bridge which spans the stream is to land commerce."

The court sustained the bond issue as against the objection that it covered several unrelated purposes, saying:

"Guided by the principles which we have stated, we are constrained to hold that, *while the proposition is divided into four parts, taken together they form but one rounded project—the creation of a great harbor,* by utilizing, developing, and uniting the waters which nature has so bounteously provided."

Thus, it appears that the bond issue would have been held wholly invalid if the court had not found that the $350,000, included therein, to be expended "in the acquisition for public uses of sites for wharves and docks," was an expenditure of the same nature as the $750,000, included therein, for excavating the Lake Washington canal, and the $600,000, included therein, for acquiring the right of way for the straightening and deepening of the Duwamish river, and the $50,000, included therein, for the diversion of the Cedar river into Lake Washington.

After the bond issue had been validated by chapter 3, Laws of 1911, and its legality approved by the court in the case of *Blaine v. Hamilton,* the county brought an action to condemn a site for a dock in the Duwamish waterway. The court held, in *State ex rel. Wauconda Inv. Co. v. Superior Court,* 68 Wash. 660, 124 Pac. 127, Ann. Cas. 1913E, 1076, that the county did not have the right of eminent domain for that purpose, suggesting that "it is presumed that the legislature intended that the necessary property should be acquired by contract." That case was decided on June 5, 1912. We quote the following from the journal of the proceedings of the county commissioners of June 26th:

"The following proposition for the purchase of Union Trust Company island as a dock site was submitted by the Union Trust Company, and, on motion, same was accepted, and it was ordered that said island, less exceptions as noted, be purchased and paid for out of the 'Dock and Dock Sites Fund,' at $63,500. Messrs. Hamilton and Rutherford voting 'Aye;' McKenzie voting 'No.'"

In September, 1912, the county took a warranty deed to the property, subject only to the rights of the commissioners of the waterway district, under an action which they were then prosecuting to condemn the right of way necessary to straighten and deepen the Duwamish river, in which action benefits were to be assessed and a small portion of the western side of the island was to be taken.

This property, as the name by which it was designated indicates, was an island. It was a long, slightly crescent-shaped piece of land lying in the Duwamish river. We estimate, from other distances shown on the maps in the record, that it was between 1700 and 1800 feet in length, and between 275 and 300 feet in width at its widest point. Being an island, it was, of course, not usable as a dock site in its then condition.

The waterway district's plans were fully matured at the time the county purchased the island. In fact, they were matured at the time the bond issue was proposed, as is definitely shown by the resolution of the county commissioners. The waterway district, at the time this property was purchased, was, as the deed recites, already condemning its right of way. The straightened waterway was to run lengthwise along the west side of the island, and the old river bed on the east side of the island, cutting it off from the railroads and east Marginal way, was to be abandoned. This would permit access to the island by building a causeway from Marginal way across the abandoned river bed.

But more than that was required in order to make the property a desirable dock site. If a dock should be constructed parallel with the river, there would not be more than 1800 feet of berthing space, and ships lying along the river would be an obstacle to the navigation of the channel, and especially so when being

loaded from scows swung alongside. There is oral evidence that the plan was to extend waterways or slips inland, angling slightly to the south. This would permit railroad spurs to be run along the side of the slips and for vessels to lie alongside, completely out of the navigable channel. It would also multiply the berthing space. The island property, because it was only approximately 300 feet wide, would not afford slips long enough to berth large ocean-going ships. The acquisition of the old channel of the river to the eastward of the island was necessary in order to convert the island into a suitable dock site. If that were joined to the island itself, this would permit slips of at least 700 feet in width. At least four such slips could then be built, wide enough to accommodate vessels on both sides, giving 5600 feet of berthing space.

That this was the plan which everybody having any connection with the Duwamish river improvement had in mind, is amply shown by oral evidence in the record, and that evidence receives confirmation from the fact that the county commissioners afterwards acquired the abandoned river bed and excavated and built such a slip at the north end of the property.

There were two ways in which the county might get title to those portions of the abandoned river bed which it needed to make a practical dock site out of the Union Trust Company island. Section 8 of chapter 11, Laws of 1911, p. 21 (Rem. Rev. Stat., § 9732 [P. C. § 1374]), provided that such abandoned beds "are hereby given and granted and vested in the respective commercial waterway districts now existing, or hereafter to be formed," and the commissioners of the waterway districts were given the right to sell such beds and shores upon such notice and proceedings as the law provided that boards of county commissioners should be gov-

erned by in the disposition of real estate belonging to the counties:

"*Provided, however,* That the commissioners of such commercial waterway district may, in their discretion, exchange such abandoned beds and shores, for other property needed in the straightening, deepening or widening of such rivers, watercourses or streams, and which exchange may be made upon such terms and conditions and in such areas as, in the discretion of such commissioners, they may deem advisable and for the best interests of such commercial waterway district without any notice or other formality or proceedings whatever."

If the sale method was adopted, the waterway commissioners would be required to publish notice for four weeks of intention to sell, hold a hearing at which any taxpayer would have the right to be heard, and, after making a finding that such sale was advisable, publish notice for four weeks that the property would be sold at public auction on a day and at a place certain. Rem. Rev. Stat., § 4007 [P. C. § 1710] *et seq.* At an auction sale, the county, of course, would be subject to the competition of any and all bidders; but, if the county had some property which the waterway district needed in order to straighten and deepen the river, then the waterway commissioners could exchange the abandoned river bed for that property at their discretion and "without any notice or other formality or proceedings whatever."

On January 9, 1913, the county commissioners passed a resolution, reciting, in part, as follows:

"WHEREAS, the county of King still has a possible claim or interest in and to the use of all those portions of the streets, avenues, alleys, public roads, highways, and other public places within the limits of the right of way of Commercial Waterway District No. 1 of King county, state of Washington, and

"WHEREAS, said Commercial Waterway District has

a possible claim or interest in and to all that portion of the present bed or channel and shores of the Duwamish river lying east of the east margin of the right of way of said Commercial Waterway and extending from the point where said eastern margin intersects the right bank of the Duwamish river immediately above Union Trust Company Island, to a point where said eastern margin of said right of way intersects the right bank of the Duwamish river immediately below said Union Trust Company Island; and

"WHEREAS, both King county and said Commercial Waterway District desire to co-operate with each other in the commercial development of King county; and

"WHEREAS, *King county has acquired and is now the owner of a large portion of said Union Trust Company Island for dock purposes, and desires to develop the same unhindered by any possible claim on the part of said district in and to the said described portions of the bed and shores of the Duwamish river, the same being contiguous to said public dock property; and*

"WHEREAS, the present right of King county in and to the use of said portions of roads, streets, etc., above described is a doubtful claim and one which the county does not wish to insist upon for the reason that to do so would impede the development of said Commercial Waterway; and

"WHEREAS, *it is considered by this board and by the Board of Commissioners of said Commercial Waterway District to be to the mutual advantage of said district and said county, that an exchange be made by said King county and by said Commercial Waterway District each to the other of their respective interests in said portions of said public roads and said described portion of said river bed;*

"Now, THEREFORE, be it resolved by the Board of Commissioners of King county that an exchange be made by said King county with said Commercial Waterway District whereby said King county will forever grant to said Commercial Waterway District No. 1, the right and privilege to extend its waterway through and over all of said described portions of the public roads, etc., and other public places within the limits of

the right of way of said Commercial Waterway District, in exchange for a quit claim deed by said Commercial Waterway District and its commissioners of all their interest in and to the said described portion of said channel beds and shores of the Duwamish river; and . . ."

On the previous day, the waterway district had passed its resolution dealing with the matter, which reads, in part, as follows:

"WHEREAS the County Commissioners of King county, state of Washington, have offered to execute and deliver a quit claim deed to this district of all the county's right, title and interest in and to the public roads, streets, avenues, alleys and other public places within the limits of the right of way of this district for the purpose of being used in the construction and maintenance of said Commercial Waterway, in exchange for a quit claim deed from said district, and its Commissioners of all that portion of the present channel or bed of the Duwamish river described as follows:

"All the following portion of the present bed or channel of the Duwamish River to-wit: lying East of the East margin of said right of way and extending from the point where said eastern margin intersects the right bank of the Duwamish River immediately above Union Trust Company Island, to a point where said eastern margin of said right of way intersects the right bank of the Duwamish River immediately below said Union Trust Company Island; and

"WHEREAS, this board deems it advisable and expedient to secure such conveyance from King county of its interest in said portions of public roads, streets, etc. said portions being needed in the construction and maintenance of the Commercial Waterway in said district; and

"WHEREAS, *said King county expects to develop Union Trust Company Island and adjoining portions of the bed, channel and shores of the Duwamish river as a public dock which when so developed will be of great benefit and advantage to said Commercial Waterway and to the entire district;* and

"WHEREAS, this board deems it advisable and for the best interests of the Commercial Waterway District that said exchange be made; . . ."

On January 9, 1913, the waterway district gave a quitclaim deed to the county for that portion of the river bed described in the resolutions. Later, on May 8, 1914, and on July 22, 1919, it gave additional deeds called "correction" deeds, although the description of the original deed corresponds with the descriptions in the two resolutions. None of these deeds contains any limitation on the use of the property. In the first deed, the consideration is recited as one dollar, and, in the other two, one dollar and other valuable considerations.

Having acquired the abandoned river bed to the eastward of Union Trust Company island, the county proceeded to improve the whole property by filling in the old river bed, bulkheading the tract, and filling it up to grade. In doing so, it expended $40,000 of the money voted by the people for "acquisition for public uses of sites for wharves and docks." These expenditures were made in 1914 and 1915. In making them, the county excavated a slip at the northerly tip of the island and across the abandoned river bed east of it, and in September, 1917, let a contract for the erection of a dock or wharf along its southern edge, at a cost of $31,853.94. In February, 1918, it added forty feet to the length of the dock at a contract price of $11,800. All of these sums were paid out of the money voted by the people for the acquisition of wharves and docks for public uses; that is, out of the $350,000, voted on November 8, 1910, for that purpose, $147,153.94 was expended in the acquisition and development of the site within the first eight years.

In the deed which the lower court canceled and annulled, the county of King purported to convey to

the Hemrich Brewing Company a strip of land approximately nine hundred by three hundred feet, running across the dock site from the Duwamish waterway to east Marginal way, the northern edge of which is about two hundred feet south of, and parallel to, the northern edge of the wharf constructed in 1917 and 1918. For convenience, this property will hereinafter be referred to as the Hemrich tract. If the original plan of development had been, or should be, continued, by working from north to south, the next transverse slip would fall partly, if not wholly, within its boundaries.

The property included in the deed is made up of four parts. At the southwest corner of the tract next to the waterway is a small, wedge-shaped piece of the old river bed; then there is a strip of what was formerly the old Union Trust Company island, about three hundred feet in width; then a portion of abandoned river bed, approximately four hundred feet in width; then, extending to Marginal way, a piece of upland, approximately one hundred and fifty feet in width, acquired by the county in 1933. The court held that the county had no power to sell those portions of the tract which were formerly a part of the Union Trust Company island or of the old river bed, on the ground that they were part of a dock site held in trust by the county for public uses.

The respondents say that there is but one question presented by this appeal, and state it as follows:

"In 1912 the board of King county commissioners acquired a tract of land now fronting on the Duwamish waterway for public dock site purposes. A part of the tract consisted of Union Trust Company island and was purchased and paid for out of the 'public dock site' portion of a harbor bond issue. The balance of the tract consisted of an area of abandoned river bed contiguous to said island, which was conveyed to the county by commercial waterway district for public dock site pur-

poses. The deeds themselves did not contain any clause purporting to restrict the use which the county might make of the property.

"The county improved the entire tract by filling and bulkheading, and constructed a public dock and wharf on a portion thereof, all being paid for by warrants on the said 'public dock site' fund.

"Does the county have authority to sell a portion of the original tract which as yet has never been actually used as a public dock or wharf? The lower court's answer was 'No.' "

The appellants break up the matter into a number of subsidiary questions, of which, we think, only the following requires special attention:

"Even though the property might have been acquired by the county in its governmental capacity, did not the county have the right to sell it where it appears that it was never appropriated or used for the purpose intended and that it is no longer necessary for that purpose?"

Before an attempt can be made to answer these questions, and particularly the second, a further statement of facts is necessary. The appellants point out that, although a public dock was built on the dock site, it was never publicly operated; and further, that some portions of the dock site have been deeded away; and still further, that other portions, including those covered by the Hemrich deed, have been leased for industrial uses for long terms. In April, 1916, the county conveyed a tract of land, formerly a part of the abandoned river bed, to Samuel S. Loeb. No part of this tract is east of, or touches, the old Union Trust Company island, and, for that and other reasons, we are not clear whether it has ever been a part of the dock site; nor is it necessary to determine that question in this action. In 1919, the county conveyed a small portion of the abandoned river bed, which was a part of the dock site, to grantees, in exchange for lands which it

needed in order to get access from Marginal way to certain lands which it owned on the river. An alley was condemned across the site, immediately south of, and adjoining, the Hemrich tract, and a street along a part of its extreme eastern edge.

A tract south of the Hemrich tract was leased to Seattle Warehouse Company in 1922, for a period of thirty years, to be used only for warehouse purposes. A warehouse, costing $85,000, was built upon it, and the tract has been re-leased to another warehouse company, presumably a successor to the first, for a period of thirty years from 1930. South of that, a large sawmill and burner have been operated from time to time since 1925.

The Hemrich tract itself has been under lease for commercial purposes for many years. It was leased in 1917, with other property to the north of it, including that part of the property on which the wharf stands, for a period of thirty-five years, to be used only for commercial, manufacturing, and industrial purposes. Subsequently, in 1918, it was included in another overlapping lease covering even more property towards the north. Subsequently, the dock property was stricken from the lease, and the 1918 lease modified by a supplemental lease which provided that the dock property, that is, the existing dock, should be, and remain, "for public enjoyment and use as a public wharf or dock." Various leases and sub-leases followed, which it would be unprofitable to detail. It will suffice to say that, by 1933, or shortly thereafter, they came into the possession of the Hemrich Brewing Company. It has buildings upon the property of a value of $252,000, all of which were erected while the property was held under lease. No part of the tract it occupies and which was deeded to it on August 13, 1937, was ever used as a public dock.

On these facts, the appellants claim an estoppel against the respondents, and further contend that, even if the dock site was acquired by the county in its governmental capacity, it now has the right to dispose of it, because, it is said, time has demonstrated that it is not needed for the purpose for which it was acquired.

We are of the opinion that the trial court was correct in holding that both that portion of the old Union Trust Company island and that portion of the abandoned river bed included in the Hemrich tract were acquired by the county in its governmental capacity. It seems to us that this is an inevitable conclusion, from the facts which we have already stated. By their resolution of July 26, 1910, the then county commissioners requested the voters to provide funds to enable the county to cooperate with the United States government, the state of Washington, and Commercial Waterway District No. 1, in enlarging and improving Seattle harbor, ". . . lest the commerce of the North Pacific Ocean, of Alaska, and of the Orient be attracted to ports of other states or to British Columbia, . . ." The resolution spoke of the project as of "national, state and county benefit." It asked for authority to raise and contribute $750,000 toward the excavation of Lake Washington canal and $600,000 to assist the waterway district in acquiring right of way for straightening the Duwamish river and in dredging it in order that ocean-going vessels might have access to Lakes Washington and Union and might penetrate deeply into the flat lands south of the city. Speaking of the then existing harbor, Elliott Bay, the resolution said:

". . . and all the waterfront on said bay, except a few street ends owned by said city, is privately owned and privately controlled, some of it by indi-

vidual concerns, but most of it by railroad and steamship lines. .. . ."

It was to prevent such a condition on the new waterfront that the county commissioners asked the voters to authorize the borrowing of $350,000 to be expended

". . . in acquisition for public uses of sites for wharves and docks and of other rights and interests necessary or proper to be acquired in aid and furtherance of said improvement."

At no place in the long resolution, which was incorporated in the notice of election, is there the slightest intimation that the county proposed to acquire or operate a dock in a proprietary capacity. The money was asked for to further the general purposes of the harbor project by acquiring and preserving for the public, dock sites, places where docks might be built when necessary upon the new waters to be opened up by the proposed Lake Washington canal and the Duwamish waterway.

It is clear that, had the purpose of the expenditure of the $350,000 requested of the voters been to acquire a county proprietary interest, the whole bond issue would have been invalidated in *Blaine v. Hamilton*, 64 Wash. 353, 116 Pac. 1076, 35 L. R. A. (N. S.) 577. It was validated because the court held that the proposed expenditure for dock sites was of the same nature as that to be made for excavating the canal, creating the waterway, and diverting the Cedar river, that is, "the creation of a great harbor."

Having persuaded the voters to supply the fund by these representations, the county proceeded to devote it to the purposes indicated. The Union Trust Company island was purchased for a dock site, as is indicated by the facts that (1) it was paid for out of the dock site fund in September, 1912; (2) by the recitals in the resolution of the county commissioners

of January 13, 1913; and (3) by the acquisition of the necessary river bed and the later improvement of the whole as a dock site by bulkheading, filling, grading, and then by excavating a slip and constructing a dock across the property. All such improvements were paid for out of the fund voted by the people to acquire dock sites for the further development of the one rounded project, a great harbor.

In view of these facts, we think it unnecessary to discuss the appellants' contention that the property was never dedicated or appropriated as a dock site. We will not assume that the county commissioners misused the funds voted for governmental purposes to acquire a proprietary interest, nor will we conclude that they could defeat the public interest by merely failing to publish a map showing the property with the legend "dock site" printed upon it. The intent to devote the Union Trust Company island, and that much of the abandoned river bed which was necessary to its practical development as a dock site, to that purpose, is abundantly shown, and that is all that is necessary to constitute a dedication. *Seattle v. Hill,* 23 Wash. 92, 62 Pac. 446.

We are not impressed with the argument that the respondents are estopped from contesting the attempted sale and transfer in fee. It is difficult to see how public inaction could confer a power to sell; and in any event, if the county acquired the property in trust for the public, the fact that it may have breached the trust on former occasions or in certain particulars, if it actually did so, would not debar the public from objecting to further and additional breaches.

In this connection, it is urged that the respondents stood by and permitted the county to make long leases for industrial purposes. But it may be that this was not a breach of the trust. The appellants seem to

assume, in this branch of their argument, that, if a trust existed, its primary obligation was that the county should at once establish a public dock. We find nothing in the resolution initiating the bond issue warranting such an assumption.

The representation to the voters was that the county desired authorization to cooperate with the Federal government, the state government, and the waterway district in enlarging the Seattle harbor by constructing the Lake Washington canal and the Duwamish waterway. It was pointed out that the waterfront of the then existing harbor had, with the exception of a few street ends, passed into private control, "most of it," said the resolution, into the control of the railroad and steamship lines. Authorization was asked to borrow and expend $350,000, "in acquisition for public uses of *sites* for wharves and docks." It will be noted that the money was not asked for, nor supplied, for the purpose of building and operating wharves and docks. The idea held out to the voters was that the $350,000 was to be used to acquire dock sites in order that the new waterfront to be opened should not, like the old, pass almost wholly into private hands. Obviously, the representation to the voters was that the $350,000 was to be used to acquire the fee of some of the new waterfront and hold it for the future public use.

It would be unreasonable to suppose that anyone connected with the development of the larger harbor was so visionary as to contemplate that a great new system of docks would be needed the moment the canal and the waterway would be completed. The idea was to insure that the waterfront would not all be in the hands of railroad and steamship companies when the development should come. It may well be, then, though we do not here so decide, that it was

not a breach of the public trust for the county to grant leases on the property and thus secure a temporary income while waiting for the public need to develop. *Inland Waterways Co. v. Louisville,* 227 Ky. 376, 13 S. W. (2d) 283.

It is also urged that the appellants are estopped because they made no objection to the conveyance of a certain portion of the abandoned river bed to one Loeb. But, as we have hereinbefore indicated, it is by no means clear from the record that the trust attached to that particular tract. Nor are we able to say that the county's exchange of a small part of the abandoned river bed with the Seattle Warehouse Company in order to get access to the waterway at some point undisclosed in the record constituted a breach of trust.

Finally, in that division of their brief relating to estoppel, the appellants cite but one case, *Jardine v. Pasadena,* 199 Cal. 64, 248 Pac. 225, 48 A. L. R. 509. We find nothing in that opinion supporting the appellants' theory of estoppel. The case merely holds that a taxpayer may not enjoin a city from using property as a hospital which was purchased from the proceeds of a bond issue voted to acquire a waterworks system. Neither estoppel nor the outright sale of property appears to have been involved in that action.

Both parties have cited a great number of authorities upon the principal question involved in this appeal. Many of the cases cited by appellants involve the disposition of property purchased from general funds, and others are cases, like the *Jardine* case, where the property was merely devoted to other public uses. In our opinion, the strongest case cited on appellants' behalf is that of *Dix v. Port of Port Orford,* 131 Ore. 157, 282 Pac. 109. This case involves the outright sale of a dock site and wharf purchased with the proceeds

of bonds issued to acquire such property. The right to sell was upheld. The case is, therefore, *prima facie* pertinent as to both questions under discussion.

The port of Port Orford was organized as a municipal corporation under Oregon law in 1919; its primary object and purpose, as described in the enabling act, being to promote "maritime shipping and commercial interest of such corporation." From the proceeds of a bond issue authorized by the vote of the people, the port commissioners purchased a dock site and erected and operated a wharf. At the time, Port Orford was comparatively isolated. With the coming of good roads, trucks invaded the transportation field to such an extent that the resources of the port were not sufficient to cover maintenance and operating expenses. The port commissioners contracted to sell the property to a logging company for a sum sufficient to discharge the port's outstanding bonds. In a suit by a taxpayer to enjoin the sale, the court said:

"As a general rule the power of a municipality to convey property is equal to its power to acquire it. At common law a municipal corporation, unless restrained by its charter, could dispose of property in the same manner as private individuals: 19 R. C. L. 772. In the instant case, we do not think that the property acquired through purchase was dedicated to a public use. True, it inured to the benefit of the public, but *the port was engaged in this commercial enterprise for profit* as a toll was charged any shipper who used the wharf or docking facilities. It was not open to indiscriminate use by the public. *In the maintenance and operation of this property the port was acting in a proprietary capacity: Esberg Cigar Co. v. Port,* 34 Or. 282 (55 P. 961, 43 L. R. A. 445). *It held title to property which had been acquired for strictly corporate uses: City National Bank v. Kiowa,* 104 Okl. 161, (230 P. 894, 39 A. L. R. 206 (note)). It is not a case of holding title to property in trust where there has been a dedication to a public use. It is not anal-

ogous to streets or to public highways. Due to changed conditions the board of commissioners in the exercise of their discretion determined that this property was no longer adapted to the purpose for which it was originally intended and that the best interests of the taxpayer would be subserved by disposing of the same."

If the property in the case at bar had been acquired in a proprietary capacity, as the Port Orford property was, the county commissioners could, no doubt, dispose of it upon a showing that it was no longer needed.

It is contended, however, that they may do so even though it was acquired and held in a governmental capacity. This contention is embodied in the question submitted to the court by the appellants:

"Even though the property might have been acquired by the county in its governmental capacity, did not the county have the right to sell it where it appears that it was never appropriated or used for the purpose intended and that it is no longer necessary for that purpose?"

The question is based upon unwarranted assumptions. The property was appropriated, and has at all times been used, for the purpose intended; and that it is no longer necessary for that purpose, is not proven, nor is it susceptible of proof. This is because the purpose intended was not, as appellants assume, to establish and operate a public county dock, but to procure dock sites on the new waters to be opened up by the Lake Washington canal and the Duwamish waterway and preserve them for the public until the growth of Seattle and its harbor should require docks at such locations. The fact that that need has not yet appeared, does not authorize the county commissioners to pass the property back into private ownership by disposing of the fee title. That Seattle harbor has reached the zenith of its maritime development, is not

susceptible of proof. The need for docks on these waters may arise in the future. The intention of the voters that not all of the new waterfront should pass into private hands, but that the fee title to some of it should be acquired and held in trust for the public, cannot be defeated by the county commissioners upon the theory that there is no present and immediate need.

There are several minor contentions to be disposed of. The appellants complain that the trial court erred, there being no limitation in the deeds, in admitting oral testimony to the general effect that the waterway district conveyed the abandoned river bed to the county, upon the understanding that it was to be used to round out the dock site. We will not expand this already over-long opinion to discuss this assignment, since, even if the admission of that testimony constituted error, it was in no way prejudicial, in view of the fact that there is an abundance of other evidence in the record which sustains that conclusion.

It is also assigned as error that the court permitted the respondents to reopen their case to offer evidence that the Lindbergs were taxpayers, a matter which they had overlooked until after both sides had rested. We are unable to perceive any merit in this assignment.

It is further assigned as error that the evidence submitted on that issue was insufficient. We have examined the questioned evidence and reject this assignment also.

The judgment and decree appealed from is affirmed.

BLAKE, C. J., MAIN, STEINERT, and JEFFERS, JJ., concur.